The Edelman-Gallup 4th and 6th Divisions is now in session. The Honorable Justice Mary L. Hinslop is presiding. Have a seat, everybody. Can you call the first case? Case number 1-102-2320, Margaret McClellan v. County Sheriff's Attorney, Mary L. Hinslop. Good afternoon. Before we start the clock running, can each of you that are arguing please state your name, spell your name for the record, and Appellant's Counsel, please tell us if you want to reserve any of your 20 minutes for rebuttal. My name is Kenneth Flaxman. Yes, I would like to reserve whatever time. No, you decide, Mr. Flaxman. How about five minutes? Thank you. We're pretty generous about time, so if you have something really important to say, we're probably going to let you say it. All right. And for the Appellee? I'm Counsel for Sheriff Bart Edelman-Gallup. Okay. All right. As you both probably know, we generally will allow 20 minutes per side and read your briefs, so you may start with that assumption, Mr. Flaxman, whenever you are ready. Thank you. For the recording, I'm Kenneth Flaxman for the Appellant. This, as we know, is an appeal and administrative review. Administrative review is the normal review of what the agency did, not of what the circuit court judge did. And it's limited to the grounds that the agency relied upon to reach its result. This isn't the regular rule of alternate grounds to affirm. This is the agency articulated basis for discharging Mr. Buchanan. I'm not sure it's determinative, Mr. Flaxman, but I'm going to stop you there for a minute. The case that you rely on, which I think is the Moore case, does say that, or could certainly be reasonably interpreted, albeit perhaps indicted to say that. But there are a lot of cases from this Court, at least, that have said about the administrative agencies the same thing we say about the circuit court, which is we can affirm on any grounds whatsoever. Those cases are well-read. Okay. They preceded the decision of the Illinois Supreme Court to adopt the trinity line of authority. Okay. And it's a new ballgame. We're not looking for some reason to affirm as some. Unlike this Court, the public courts are interested in doing. This Court has to look at what the agency did. And what the agency did in this case was a sham and a farce. The agency was asked by the circuit court judge to explain why you actually fired Mr. Buchanan. And they said we fired him because we fired him. This was a termination case, and we terminated him. It was a termination case from the original complaint when the sheriff said Mr. Buchanan allowed a female prisoner to be sexually assaulted. And even though there's no evidence that the woman was sexually assaulted, that anyone was sexually assaulted, we're going to fire him because the sheriff asked us to. There's no eyewitness testimony to a sexual assault. There's no scientific evidence. There's no semen. There's no DNA to show a sexual assault. But there's the hearsay evidence, though, that came in. The hearsay evidence is by the two detainees who said this woman forced us. It was actually double hearsay. Maybe triple hearsay. But they didn't say that we sexually assaulted her. They said that she sexually assaulted us. She threatened to inject us with AIDS blood if we didn't agree to have oral sex with her, or let her perform oral sex on us, I think. But that's not a basis to fire someone. But what about the rule violations? That's what they're arguing now, that, well, it's based on the rule violations. The report said not having your superior officer to review the report filed is part of filing. Well, the question that the court has to answer is, would anybody have been fired for those rule violations if the merit board didn't believe, for whatever reason, that they had led to a sexual assault? That's what they said. These rule violations caused the woman to be sexually assaulted. But there's not any evidence that they were sexually assaulted. And the rule violations seem to have been an unusual interpretation of the rules. The first rule is about keeping track of people in the detention cell, doing a count every 15 minutes. The merit board said, well, the investigator found that they did not comply with the rule. The merit board didn't say, we find that they didn't comply with the rule. We said the investigator found that. And the investigator was making stuff up about what the rule said, which the merit board adopted. They said the rule says you have to go into the cell every 15 minutes and count. Counsel, let me ask you this. Did you ask that question, do we know that no one has ever been terminated for failure to adhere to these rules? No. We don't know that because the board was convinced that the rule violation resulted in sexual assault. If the case goes back, if the court says that, well, there were these rule violations and it should go back to punishment and less determination, the merit board would, I don't know what they would do, but I would not trust them to be fair and honest. They weren't fair and honest in this decision when they said the rule says that you have to go into the cell to count. The rule, I couldn't find that in the rule. The rule was reproduced in the appendix of the brief. I don't think the court... You're basically arguing that there were no rule violations. That's true. And one of the reasons why there's no rule violation is because, well, the failure to do an inspection, at least the portion of the record that the merit board cited to involves another officer. It doesn't involve Mr. Buchanan. And there's nothing in the rule that I can find, and I dare the court to find, that says you have to go in. I don't dare. I don't dare. I suggest that the court would be unable to find in that rule anything that says you have to go into the cell to count people. Yeah, that's a tough one because they had a procedure in place whereby they would... I think Officer Colina would sort of watch and she knew every time the door was open she could see into the cell. I think the bigger issue is the report that was filed eight days after the incident. And in that report it was turned over to the investigator but was not given to his superior officer. So what? The investigator is the one, the state's attorney is the one... But the rule is to give it to... I couldn't find that in the rule either. That's supposedly part of the PREA. That's the argument. That's the rule that you have to give to your superior officer. I couldn't find that. Perhaps I read it too quickly. But I couldn't find anything that says... But it does say it's practicable through their chain of command. That's, I believe, what they relied on. Well, that's... Is eight days not practical when he had a reason for why it took him eight days? Again, you have the eight days and you have the absence through chain of command. I still think you have the question of whether that's a basis for terminating anybody. The merits of that was covering up the wrongdoing. But there was no wrongdoing based on this record that's before us by Mr. Buchanan. I want to follow up on one of Justice Johnson's questions, a slightly variation on that in terms of precedent. There were three other officers terminated. At least two of those terminations have been upheld already in this court. Can you distinguish your client's situation from those two cases? Well, Officer Caruana probably is the officer who allowed the female detainee to be in the same cell as a male detainee. And that's, I think... Wasn't that different from the evidence, though? I thought the evidence was that the other officer... There was a white officer who placed a male allegedly. Oolahan? Oolahan? Is that Oolahan? No, no, it's not. It's probably a supervisor. Oolahan had compelling evidence that he had left the building to have lunch, and I think that's why he got his job back. I think Caruana was properly fired. And the other officer was poorly represented with all due respect to my brother at the bar. I mean, they are separate cases. They're certainly not binding. I'm just wondering if you had a distinction. I think it's troubling that... It's troubling that they were all tied together. There's no real distinction of what evidence was admissible against which person. It's also troubling that there was a lack of advocacy on the part of some of the attorneys in the case. And I don't know why that is, but I'm doing the best I can, and I think I'm adequately, fully representing myself. Well, tell us, Mr. Weitzman, what's your strongest argument here as to why we should reverse... No sexual assault is my strongest argument. America is very clear that we want this man fired because he allowed a woman to be sexually assaulted. And where's the evidence of a sexual assault? Why does a woman testify and say what happened? I don't know. How many people involved testified? Nobody involved testified. There was a prisoner who was across who happened to see these things happen. He was somehow just watching the washroom detention cell for 15 minutes and keeping track of time and saw the woman go in and the male prisoner go in. But it could have happened that the female prisoner left the detention cell, went out, saw the judge, got her due date, and then put her back in the cell where the male prisoner was and was hiding. I don't know if the court is familiar with those cells, and I think the photograph doesn't do justice to what happened. But in the lockup, there are two big cells, two big bullpens with a big, giant glass window. There are two smaller cells opposite, which each has a small window which you can look in through the window, which has grates on it or a metal latticework. And in that cell, in the back of that cell, there's a privacy screen and there's a toilet. The door opens out, and when you visit your detention cell, you open the door, the prisoner steps out, and then you lock the door. You don't look in to see if anybody else is there because you're taking the guy out. It's not supposed to be somebody else there. And it's possible that if there was somebody else in the cell, we don't really know that. But isn't that why these rules and procedures are in place so that those kinds of mistakes don't happen and we can avoid someone being raped? So regardless of whether or not the person was actually raped, we want to follow these rules and procedures so that it does not occur. And so if someone's not following the rules and procedures, shouldn't there be consequences for that? Actually, there should be a rule and procedure that when you place a female prisoner into one of the Washroom Detention Cells, you somehow signify with a sign that it's in use, that there's a female held in that cell. That's what the officer, whose name escapes you right now, who was at these candidates' partners, that's what she did when she put a female prisoner in. She put out a little piece of paper that was her sign that said, but I think the way, one of the rules that we have really protects against letting a prisoner, a detainee come out while there's somebody else remaining in the washroom cell. There's supposed to be only one person in there. The onus, I think, falls on the officer who will allow the male detainees, if there actually were two who entered, and I'm not sure we have evidence of that, who let them go in without looking inside to see that it really was empty. And that wasn't Mr. Buchanan, it was a white guy. I have one small question, and then you're almost out of time, but if you want to make any last... I just want to be clear that Deputy Buchanan worked for the Cook County Department of Corrections from 1998 until he was transferred to court services. He was over at the jail or... He worked in boot camp. He used his military experience to work in boot camp. He transferred, which actually means he bid for a new position, then go to training school to work in corrections, because his wife at the time was ill with breast cancer and he wanted to be closer to home. Okay, but he was working for the sheriff before, right just in this boot camp. He was a model guy who was a rare model for the prisoners in boot camp, and here he is. Anything else on opening argument? Anything else? One more question. That's okay. I'll wait on your rebuttal. Thank you. Thank you. Counsel. I beg the court's indulgence. This is my first ever oral argument in person. Congratulations. Thank you. Good morning. ASA Emily Stewart on behalf of Sheriff Dart. May it please the court. Sheriff Dart requests that this court affirm the merit board's decision because it is consistent with the manifest way to the evidence and there is sufficient cause to support Mr. Buchanan's determination. Your honors, despite appellant's claims, this case is not about whether a detainee was sexually assaulted. It is about whether or not the merit board appropriately found that Mr. Buchanan violated Sheriff's Office Policies 321, 900, 903, 1100, and Article 10. Now, why do you say that it doesn't matter? As counsel just argued, that's the reason for the board's decision because he allowed the sexual assault to occur. I disagree. You disagree with the part that that was their decision? That was the basis for their decision? Is that what you disagree with? I do. They made the decision that he violated certain policies, not that a sexual assault occurred. I think the merit board is well aware of the fact that they're not a criminal court making criminal determinations. Now, what they assumed or what they knew in terms of public information, I can't say. But they found out. Now, let's remember there is a remand in this case specifically for the purpose of tell us why you terminated him. And the remand decision is not a model of clarity. But it does say, clearly shows termination is reasonable based on the act that occurred. And that seems to be a clear reference back to the prior paragraph that they allowed, that he allowed a female detainee, Beatrice Dykes, to be assaulted in restroom cell 106. It seems to me they were asked, why did you terminate him? And they said, we terminate him because of the act. And the act is the sexual assault. So I don't know how you want us to read this, but that's how it seems to me it reads. Well, because there's no policy that says someone can't be sexually assaulted. The merit board found that he violated certain policies. They identified those policies. And that's what they determined. So, okay, we'll talk about the policies. But I, so the merit board found that Mr. Buchanan failed to continuously monitor and visually inspect the detainees every 15 minutes and properly record such checks. What does it say he must continually monitor and visually inspect every 15 minutes? Which policy is that? Sure. Brief. So it's court services policy 900.3.3B and 1100.3.8. And those should be available in the record, I believe. I'm sorry. 900.3.3B. 900.3.3B. Yeah. All detainees shall be visually inspected as required by the prisoner safety check policy. Right. And I don't see that as continually monitored. Visually inspected according to the 15-minute inspection reports. That's not, I must have my eyes on every one of you continually, which would be a different requirement. He clearly did not have his eyes on every one of his detainees every second. No question. But I don't see anything in the policy or the rules that says that's his job. Your Honor, I'd just like to direct your attention to page C840 of the record. It's rule, court services policy 1100.3.8, lockup monitoring, all holding areas shall be subject to... Continual monitoring with a visual inspection every 15 minutes at a minimum. Continual monitoring does still not sound to me like, especially when it says with a visual inspection at least every 15 minutes, does not sound to me. And if there is a policy, please tell me. But if there's anything that says you, Deputy Buchanan, must know where each one of your detainees are at every moment. Because I agree with you. If that were the policy, he violated it. But I don't see that in the policy anywhere. So, I apologize. You don't need to apologize because you're not the first one that's done this. This is what sort of has been the continuation as though he is 100% responsible for every detainee every moment they're in lockup. I think if you look at page 1017 to 1018 of the record, which is Mr. Buchanan's OPR interview, he clearly states that he is always responsible. I read that. Okay. And I heard him say that. But that's not, I need to know where every one of you are every minute. Well, I think that's the very essence of his job. Really? You really think each deputy is supposed to know where each one of their detainees, they're going in and out of the apartments, they're going upstairs and downstairs. I don't see. Okay. Yes, because they're assigned a certain number of detainees. I think somewhere 12 to 15. 12 to 15 detainees for the day. And they are responsible for those detainees when they move them up out of lockup. Overall, yes. But I just, again, I think if you wanted to, if you and not you, but if the sheriff wanted to make them 100% know every minute where every detainee was, there would have to be a specific procedure. And I don't see it. But I now understand what you're relying on. Yeah. Well, you know, I think it's, they're responsible for taking their detainees to and from the holding cells to the courtroom and taking them back to lockup. And I think if they weren't aware of where those detainees were, the public would be unsafe. The judges would be unsafe. It would just be an unsafe environment for everyone involved. So I do think that's the very essence of their responsibility and duty. But he was relatively new to the group, and he and Deputy Colina kind of had a policy that she would let him know that apparently she could see into the lockup, and she would let him know that, you know, everything looks good. You mean Deputy Carter was a new candidate? Yes, yes. Deputy Carter. Yeah. That is what they testified to. That is also what Deputy Colina and Deputy Fulonian testified to as their process. But the fact of the matter is that we have, I think the record clearly shows there's no evidence whatsoever that when Beatrice Dykes went to a court hearing at around 1115, came back, was placed in the bathroom holding cell 106, Deputy Colina went on his lunch break. There's no evidence whatsoever that she was removed from that cell. And what we do know is that there was a male detainee in that cell because the appellant removed a male detainee from that cell. Right. I mean, there's no evidence that Deputy Buchanan put any male detainee into that cell. That's absolutely no evidence. He was actually surprised by that fact. But he was also still being trained to some extent because he had been there for a very short time. The other officers had been there for 17, 20 years. That's true, but that doesn't make up for the fact that these policies are meant to address very serious things. Well, but it matters, I think, if we're talking about a serious violation that requires termination. Because you're saying that the termination is not based upon the sexual assault. I know you just went back and forth about that. I'll stay out of that. But you're now relying on the rule violations, correct? Absolutely. Yeah, so that's the question becomes whether or not, and this is counsel's argument, not mine, that whether or not the rule violation that you're relying on rises to the level of a termination. So under this court's precedent, you know, deference should be shown to the merit court's sanction, that they decided that termination was appropriate in this case. And one of the issues, one of the concerns they have... Well, what's the deference if we believe it's against the manifest way to the evidence? Well, deference, no, deference to the substantial cost to, sufficient cost to terminating. But we don't get there unless we agree that either, if we think what the board did was because of the assault, that there was evidence of an assault, or if we accept your suggestion that, no, they did it for rule violations, that there were rule violations. So the first question is whether the evidence supports the findings before we get to whether those findings give cause to termination, correct? Yes, and I do think that there were rule violations. I think Mr. Buchanan conceded that he was responsible for his detainees, and we know that a male detainee was in bathroom holding cell 106, and there's no evidence that a female detainee was removed from bathroom holding cell 106. We know that he failed to include relevant information. There's no evidence that Deputy Buchanan placed the male into that cell, only that he received a phone call and was told to come and get him out of the cell, and he did testify that when he came, his detainee was standing at the door. He let him out and took him to the other holding cell. Well, I think it again goes to Justice Nichols' question with respect to whether or not they are required to continuously monitor their detainees, and we as, and Sheriff Yard asserts certainly that they are required to continuously monitor their detainees, whether by listening for them, by visually inspecting them, but at some point something happened to allow a male detainee to get placed in bathroom holding cell 106. Right, and it seems though that there were four deputies, two courtrooms, and four cells, and they kind of just, two larger cells and two smaller cells with the bathrooms, and they just kind of worked together. So we don't know who placed him into that cell, and there's no evidence that Buchanan did. There isn't any evidence that Buchanan did, but Mr. Buchanan certainly said that he never, both Mr. Buchanan and Deputies Houlihan, and I'm not going to mention Deputy Kulina, because she didn't testify at the Maribor hearing, so I don't want to, she wasn't cross-examined by counsel, so I'm not going to include her OPR statements, but there's certainly evidence to show that they did not work together, that they worked independently. These were their prisoners, and the prisoners at 105 were Mr. Buchanan's and Ms. Carter's prisoners, and that they did not take them out of the cells and take other people's prisoners out of the cells. They were counsel for theirs. Okay, assuming there's no allegation of rape, do these other rule violations typically rise to the level of termination? Yes, and I think it's really important, whether it's gross negligence on behalf of Mr. Buchanan or an attempt to hide what happened, because we know that all the officers involved improperly filed incident reports, excluded important information, but Mr. Buchanan, he removed Mr. Drake from Bethel Holding Cell 106. Fifteen minutes later, ten, fifteen minutes later, he took Mr. Drake downstairs to the holding cell. Mr. Drake then immediately said, I was raped. Well, my question is, without rape, his failure to issue a report timely and failure to inspect, do those rise to the level of termination? Yes, because these violations, one of them is violating the rules that were put in place to prevent, to help eliminate rape in detention facilities, and those rules are very serious, and if officers don't follow them, that's a very difficult question. So there's not a graduated warning process? Well, I think it depends. Well, first, I think this Court has to determine whether or not the finding of fact with respect to Mr. Buchanan's dishonesty and misrepresentation of the facts is supported by the record, and if they do, under this Court's precedent, under Rios, that alone is enough to justify his termination. What's the evidence of dishonesty? Is the only evidence you're relying on the fact that his second report came in eight days later? Is that what you're calling dishonest? Well, I'm saying that 15 minutes after he took detainee Drake out of Bethel. We understand the scenario. I'm asking if you're relying on anything other than the fact that his report came in eight days later, even though the evidence was uncontradicted, that he started trying to file that report the very next day. Well, it came in eight days later. It was not submitted. He actually filled out two incident reports on the first day. So he corrected the first one. And he knew both of those reports. He got signatures from supervisors on both of those reports, but he decided to circumvent that policy altogether with respect to his supplemental incident report. Was there any evidence that he was told, that he was informed, that he was advised, this is how supplemental reports need to be filed, and he circumvented it? There's a clear space on the report that requires a supervisor's signature, and just as there was on the initial incident report. So that's what you're relying on, that there's no signature on the supplemental report. Right. And he offered no evidence whatsoever in his merit board testimony to suggest, and in fact he admitted that he didn't provide it to his supervisor. So whether or not he didn't think it was a big deal to get the report in or whatever reason he chose to wait, he gave pretty clear testimony about what happened, that he went on the computer, that he had never filed a report before. There was clear testimony and uncontradicted testimony as to why it took eight days. Right? I disagree, Your Honor, because he claims he actually ended up not receiving any assistance with the report typing and et cetera. He claims he just didn't know where it was. And the individual he sought assistance from, which was Deputy Harp, he stated in his merit board testimony, and let me, I'm not in his merit board testimony, but it's an OPR interview and I'll pull up the exact site for you. If you look at C1042 and C1046, he says he's been sitting on it too long and that Deputy Harp had asked him every day, did you submit the report? Did you submit the report? Did you submit the report? And he didn't take it seriously and he didn't do it. Did Deputy Harp say he didn't take it seriously or that's what you're saying? Well, that's what I'm saying. Okay. But he did admit that Deputy Harp asked him about it constantly. Okay. I have a different question for you, but on the, putting aside the reporting, on the inspection reports, the 15-minute inspection reports, I'm very confused as to where you think the violation was. What was it you think was required? And I didn't mean you, but I mean the sheriff. Sure. Things was required in these 15-minute inspection reports that he didn't do. That he did not record his visual inspections. And the report requires an initial. So that from the sheriff's perspective, that those initials are there to hold people accountable for those 15-minute checks. And if someone else is conducting the checks and someone else is initialing the form, then it's impossible to hold anyone accountable if something happens. But the testimony was contradicted in both courtrooms that that's how they've been doing it for years. That's correct. Okay. So you're saying he and somebody who'd been there a month should have said, no, we shouldn't do it this way. This is what the rule requires? Is that what they're saying? I mean, you're saying that the rule says something different than what everybody had been doing for years and years. I think it's axiomatic that if someone is asking for initials, that they're asking you to put your name on the line for something. And if you are not conducting the checks, that you would hesitate to do that. And what language exactly are you relying on in the reporting requirement? I'm relying on the forms themselves. The forms themselves, which have a place for two signatures. Right. They have a place, so that suggests that the partners do it together. I believe they have at the bottom, maybe, three signature lines. But for each 15-minute interval, there's only one space for an initial. Right. But then there's three signature lines at the bottom, suggesting partners do it together, one-person initials, and they all sign up. Well, I think what that means is that you verify the checks that you completed, and your partner verifies the checks that they completed.  You initial the timeframe for that particular check, and then, you know, essentially verify that check later in the day. Okay. So Mr. Buchanan conceded that he did not include relevant information in the original incident reports. He conceded that at C-725. He also conceded, again, at C-1042, that he waited too long to submit the supplemental incident report. And any attempt by Mr. Buchanan to reduce the Mayor's Court's findings to whether there was a sexual assault is disingenuous. A finding of sexual assault is not necessary to find that plaintiff violated the Sheriff's Office policies. The Mayor's Court heard the evidence, weighed the credibility of the witnesses, and determined that Mr. Buchanan violated five different Sheriff's Office policies and procedures. Policies and procedures put in place to provide for the safety and security of detainees ensure that all allegations of sexual assault are properly addressed in Cook County's detention facilities, and policies and procedures meant to safeguard the integrity and good public standing of the Cook County Sheriff's Office. The Mayor's Court's findings are consistent with the manifest weight of the evidence and should be affirmed respectfully. The Mayor's Court's decision to terminate Mr. Buchanan should also be affirmed. This Court has stated on numerous occasions that a violation of a single rule may constitute sufficient cause for discharge. It has been held that sworn law enforcement officers' dishonesty constitutes just cause to terminate this employee. Here, the Mayor's Court found that Mr. Buchanan lied to OPR investigators when he attempted to conceal, related to his attempts to conceal information relevant to an allegation of rape from his superiors. And under this Court's precedent, I submit that that dishonesty alone justifies his termination. But that is not the only thing in the record that supports his termination. There are many others... Why do you believe that he concealed the evidence of the rape? Because when the detainees asked to speak with the sergeant, he immediately took them to the sergeant so that they could make their report. I'm not saying that he tried to conceal the rape. He tried to conceal the fact that he waited eight days just to complete a supplemental incident report. How would he conceal that he waited eight days? He's the one that filed the report eight days later. He admitted to that. He never filed it with the Sheriff's Office. He only sent it directly to Cook County State's Attorney's Office. And so the only reason that OPR and the Sheriff's Office became aware is because they had requested some additional records from the State's Attorney's Office. Had they not done so, they would have never known that Mr. Buchanan had filed a supplemental report. I want to follow up with you if you have two minutes. But I found the form, and I only see room for one initial at each time schedule. So why are you saying that each of them are supposed to initial this form when there's only room for one? No, that's what I'm saying. You're saying that he's supposed to fill out a separate one even though there's room for two deputies on it? I'm just confused. What I'm saying is that since there's only one place to initial, the person who's initialing should be the person conducting the check for that particular time period. Then why does each one have room for two deputies to sign the form? Because they might conduct the 15-minute checks differently. One person might conduct the 115 to 130 check, and another person might conduct the 215 to 250 check. Then they don't have to do it every 15 minutes? No, they do have to do it every 15 minutes, but what I'm saying is there's no policy to say that one person has to do all the checks throughout the day. But whoever does the check should be initialing the form, verifying so that there is some accountability in the system and everybody can't throw up their hands, as is the case here, and say, I don't know what's going on. So you're saying the problem is that one person visually checked and the other partner checked it, and that it's clear from the form that that's not supposed to happen? That's correct. Okay. And it's clear from the rule that that's not supposed to happen, you're saying? It's not clear from the rule, but you're saying it's clear on the form? Yes. I mean, again, if you're initialing something, there's a reason you're doing it, and it supports accountability in the system. Okay. And so for those reasons and those stated in our brief, I ask that you affirm the mayor's board's decision. Counsel, I have a, and this may be a very basic question, but initially the two male detainees are the ones that made a report that they had been assaulted. That's right. But the findings of the mayor's board indicate that the female detainee had been assaulted. I can respond to that question. I'll have to refer to public information, but there was nothing in the record. Well, that's not true. There was an investigation that was conducted by the state's attorney's office, and I believe that that investigation report is included in the record showing that Ms. Dykes, there were allegations that Ms. Dykes was the one sexually assaulted. Allegations by whom? By Ms. Dykes as the investigation process. Okay. There were no visible evidence before the board as to that. That's correct. Okay. Thank you. Let me just say, you did an excellent job for your first. Even if it wasn't your first, you did an excellent job. Sometimes you have cases where the panel will have a lot of questions, and that's not a bad thing. I'm not sure if I'm looking at the same page in the record that the court is about two signature lines on the bottom of the checking form. The prisoner safety check sheet is in the appendix at A84, or it's C778. That has one box for initials. The next page in the appendix. What page of the appendix? I'm sorry, what? Appendix 84. Okay. The next page in the record, which is not in the appendix, is the prisoner disposition sheet, which has three signature lines, or room for three signature lines, which shows what happens to each prisoner when they came to court and when they left, whether they get a new date or whether the case is resolved. That's different than the other. You are correct, and I am misreading these forms, and I appreciate the correction. Okay. Thank you. There is a question that I've been fearful of. It's time. Well, you may proceed. No, I have nothing more. I would still have to answer any more questions if there are. Otherwise, thank you for your time. All right. Give me a moment, please. Thank you. Thank you. Hold on one second. Hold on. I actually have one question while you're looking for that one. Do you mind? Go ahead, because I didn't mark it. Okay. Am I correct that, if you know, when the deputies are – the deputy, for example, Mr. Buchanan, would be taking his detainees back and forth to the courtroom and then returning to the lockup. Is that correct? That was part of his job? Right. You take – right. And then there are two deputies. One is in the court. The other one goes back to the lockup or – depending on how dangerous the prisoner is. But then the one back in the lockup also has to go in and out of court. I mean, you can't – I guess what I'm trying to establish is, would it be possible even to actually keep your eyes on all of your detainees every minute? No. Because you're going back and forth. If that was important, there'd be surveillance and people watching the surveillance of what's happening in the lockup, in the detention cells. And there's not enough manpower to do that? No. It could be outsourced to China to – but that's not done. Actually, my question was somewhat related. I believe in your brief you indicate that this is how inspections are done at Markham, which would cause someone to infer that each of the courtrooms operates this way. Is that correct? Or is it just the pattern in practice of 105 and 106? No. The evidence is that that's happened. That's the way it's done. The supervisors know that it's being done that way, and they say, fine. How else can you do it? Despite that the rules say do it otherwise? The rules don't say that. The rules say this is what you do, and if there are any further questions, look at the form and comply with the form. And it doesn't say to do something that's impossible. Okay. All right. Thank you. Thank you both very much. And we will take this matter on advisement, and you will hear from us in due course.